**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Criminal No. 13-244 (KBJ)** |
| | ) | |
| **WESLEY HAWKINS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MR. WESLEY HAWKINS' MEMORANDUM IN AID OF SENTENCING

Mr. Wesley Hawkins, through counsel, respectfully submits this Memorandum in Aid of Sentencing in support of a sentence of one day in prison, a period of home detention with electronic monitoring, and five years of supervised release with conditions.  This sentence reflects the nature and circumstances of Mr. Hawkins' offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

There are at least three factors particular to this highly unusual case that strongly support the above sentence:  (1) Mr. Hawkins' very young age at the time he became involved in the offense conduct; (2) Mr. Hawkins' utter lack of dangerousness; and (3) that Mr. Hawkins' therapeutic needs would clearly be best met in the community, particularly given that as a sex offender he is not eligible for a prison camp.[1]  As the PSR and Dr. Carole Giunta's psychological assessment make very clear, Wesley Hawkins is a fundamentally good kid who has insecurity issues regarding his weight and social acceptance that are not entirely atypical for someone his

---

[1]      As a "sex offender," Mr. Hawkins would not be eligible for placement in a Bureau of Prisons' prison camp.  That is because one's status as a "sex offender" is a "Public Safety Factor (PSF)" that automatically bars placement at a prison camp.  *See* Excerpt from Bureau of Prisons P.S. 5100.08, Ch. 5 (Ex. 1).

age.  Mr. Hawkins also appears to have a sexual identity issue that is complicated by his mother's strict religious beliefs.  These factors, when combined with the intense hormonal mix of being a teenager, are what caused the offense conduct in this case; it was not an intrinsic sexual attraction to children significantly younger than himself.

A sentence of one day in prison followed by home detention, as well as the numerous, severe, and long-lasting "collateral" consequences of conviction for this sex offense, will be more than sufficient to punish Mr. Hawkins for what he did.  The defense respectfully submits that it is not in anyone's interest to add prison time on top of that already punitive mix and ruin Mr. Hawkins' future and prospects even further.

## <u>OVERVIEW</u>

**A.     Wesley Hawkins.**

Mr. Hawkins is now 19-years old, and was only 18 at the time of the criminal conduct. Mr. Hawkins was raised by a single mother, Earlene Hawkins Grasty, for whom Mr. Hawkins is her pride and joy.  They share an exceptionally close relationship borne of love and 19 years of dependence on one another.  As reflected in the PSR, Mr. Hawkins has barely met his biological father, though he has enjoyed a good relationship with his stepfather since he joined the family about five years ago.[2]  The Hawkins' family is of very modest means, living together in a small, two-bedroom apartment.

Mr. Hawkins' upbringing was a religious one due to his mother's devout beliefs.  As noted in Dr. Giunta's report, Ms. Grasty is very religious and "strongly frown[s]" on homosexuality.  *Report of Dr. Carole Giunta* ("*Giunta Report*") at 2 [submitted under seal].

---

[2]     Mr. Hawkins' mother and step-father will appear in court to support him at sentencing.

Throughout his life, Mr. Hawkins has excelled in school and has earned praise from numerous quarters. *See* Ex. 2 (Mr. Hawkins' awards and certificates). As set forth in the PSR:

> Those letters indicated that the defendant "is a hard working student who wants nothing more than to be successful" and "he is hard working, outgoing, tenacious and determined. Wesley is compassionate about his academics and has the ability to lead others in a positive way." Another letter indicated "I have watched him grow into an outstanding young man and youth leader," and "Wesley is of strong moral character and continues to take a lead in implementing youth driven activities for the [Ward 1 Drug Free Community] coalition." He was described as "articulate, dependable, and self-motivated.

PSR ¶ 58.

Mr. Hawkins graduated from Booker T. Washington Public Charter School on June 7, 2013, just prior to his arrest in this case. Although Mr. Hawkins received $4,000 in scholarship money for "outstanding academic achievement, high moral character, leadership, and participating in extra-curricular activities," and was to use that money to attend Shaw University in Raleigh, North Carolina this past Fall (*see* ex. 2), that opportunity was lost because of his arrest in this case. *See* PSR ¶ 58. This is among the first of countless damaging consequences that will be inflicted on Mr. Hawkins throughout his life because of this case and his status as a "sex offender."

**B.    The Nature and Circumstances of Mr. Hawkins' Offense.**

In late 2012, while sitting at home and with the simple click of a mouse, eighteen-year old Wesley Hawkins downloaded a video of child pornography from "YouTube" and irreparably damaged the rest of his life. Importantly, Mr. Hawkins' initial reaction to the images was "confusion and shock rather than arousal." *Giunta Report* at 2. Mr. Hawkins "wanted to know why kids were doing those kinds of things." *Id.* It was also notable to Mr. Hawkins that the YouTube subscriber who sent him the child porn had a lot of subscribers, i.e., that he seemed

"popular."

Based on a "cyber-tip" that resulted from Mr. Hawkins subsequent re-posting of the images on YouTube, Detective Timothy Palchak initiated contact with Mr. Hawkins on February 4, 2013 through email.  Although one possible course of action in this situation would be for Detective Palchak to announce his status as law enforcement and issue a stern warning to Mr. Hawkins to cease and desist in this conduct – which at this point had not gone beyond downloading and reposting publicly available videos from YouTube – Detective Palchak instead posed as a collector of child pornography and someone who molests his 12-year old daughter. Importantly, Mr. Hawkins indicated *no interest whatsoever* in Detective Palchak's repeated suggestions for "real time" sexual activity, i.e., a real-life sexual encounter with Detective Palchak and his fictitious 12-year old daughter.  To the contrary, Mr. Hawkins completely ignored Detective Palchak's persistent entreaties.  *See* February 4, 2013 Online Correspondence.

Over the next several months, Mr. Hawkins periodically viewed more images of child pornography using Skydrive, a peer-to-peer ("P2P") file-sharing program.  Notably, it was never an obsession for Mr. Hawkins and he did not amass a large collection, even though that is apparently very easy to do so these days.  Importantly, Mr. Hawkins' connection to the images he viewed appears to be one of identifying with his age-mates emotionally, instead of exploiting them sexually.  Mr. Hawkins said he found the fellow teenagers in the photos easier to connect with than adults.  *See Giunta Report* at 2 (Mr. Hawkins stating, "I'm really insecure about myself.  I saw them experimenting which I'd like to do but I don't know how to.").  When asked about the fact that he was most interested in other males, Mr. Hawkins emphasized that although he is interested in experimenting, his mother strongly disapproves of homosexual activity due to her religious beliefs.  *See id.*

4

When agents arrived with a search warrant on June 10, 2013, Mr. Hawkins immediately admitted to having viewed child pornography on his computer and did not try to minimize his conduct. *See* PSR ¶ 19. Mr. Hawkins has had nothing to do with child pornography since that time, and has complied with all terms of pre-trial supervision since he was released on the day of his arrest.

Mr. Hawkins' computer contained 16 digital images and 17 digital movie files containing child pornography. Notably, the images Mr. Hawkins was drawn to were sexually more mature individuals between the ages of 12-18; that is what he told the undercover officer he was interested in and that is what the images taken from Mr. Hawkins' computer reflect. This case does not involve images of infants or toddlers, as the vast majority of child pornography cases do. Mr. Hawkins did not pay for the images or trade other images for them. There was only one instance of distribution, and that was in response to Detective Palchak's repeated requests for images.[3]

While devastating to Mr. Hawkins and his mother, this case has provided an important intervention to Mr. Hawkins, and he has now made a total break from his past conduct in this area. Mr. Hawkins has complied with all conditions of pre-trial release under the High Intensity Supervision Program over the past five months. Everyone familiar with Mr. Hawkins believes that this behavior was out of character and that he will never become involved in possessing child pornography again. Mr. Hawkins is deeply ashamed and remorseful for his actions.

**C.     The Psychological Evaluation**.

Dr. Giunta assessed Mr. Hawkins' mental condition, and specifically whether he poses

---

[3]      It is at least questionable whether Mr. Hawkins should be receiving the two-level "distribution bump" under such circumstances.

any physical danger to children; whether he is likely to repeat the offense or engage in similar

activities in the future; the existence of any underlying psychological factors which led him to

commit the offense; and recommendations for appropriate treatment.  *See Giunta Report* at 1.

Based on her evaluation, which included the use of risk assessment tools, Mr. Hawkins poses a

low risk of engaging in sexual violence.  While in her view Mr. Hawkins does suffer from some

symptoms of emerging mental illness,[4] those symptoms are unrelated to pedophilia or any kind of

sexual interest in children.  Moreover, "these factors must be considered in light of Mr. Hawkins'

age and developmental level."  *Id.* at 4.  Importantly,

> Mr. Hawkins does not demonstrate sexual deviation in that he does not evidence
> "a relatively stable pattern of sexual arousal to inappropriate stimuli."  Rather, his
> interest in watching teens engaged in homosexual activity was a way for him to
> explore his curiosity about homosexual activity and connect with his emotional
> peers.

*Id.*

Overall, Dr. Giunta reports that Mr. Hawkins "should not be viewed as a classic sex

offender."  *Id.*  The report continues:

> Rather, the instant offense occurred when he was an 18-year old young
> man with age-appropriate sexual curiosity but a disconnect from his age-mates
> due to his limited social and emotional development and emerging mental illness.
> It should be noted that Mr. Hawkins does not meet the criteria for pedophilia.
> *There is no indication that he is sexually interested in prepubescent children.*
> Also, late adolescents involved in sexual relationships with teens are excluded
> from this diagnosis.  In summary, Mr. Hawkins' risk for sexual violence is low.

*Id.* (emphasis added).

---

[4]     At the conclusion of her report Dr. Giunta mentions that a psychiatric consult is
recommended to see if Mr. Hawkins' issues would be responsive to pharmacological
intervention.  *See Giunta Report* at 4.  Consistent with the observations set forth in the PSR (¶
52), it does appear that Mr. Hawkins may be suffering from Attention Deficit Hyperactivity
Disorder or something similar for which beneficial medications might be prescribed.  Notably,
Mr. Hawkins has stated that he is amenable to mental health treatment.  *See* PSR ¶ 53.

**D.      Mr. Hawkins' Young Age.**

A crucial factor to the appropriate sentence in this case is Mr. Hawkins' young age both

now and when he first became involved in the offense conduct.  When Mr. Hawkins first began

viewing images, he was only 18 years old.  Courts have consistently looked to a defendant's

young age at the time of his involvement in imposing below-Guideline or probationary sentences

in child pornography cases.  *See, e.g., United States v. Polito*, 215 F. App'x 354, 357 (5th Cir.

2007) (per curiam) (upholding a sentence of probation when use began during adolescence);

*United States v. Stern*, 590 F. Supp. 2d 945, 952-53 (N.D. Ohio 2008) (imposing a sentence of

one year and one day in possession of child pornography case, where defendant was 14 years old

at the time he began viewing child pronography); *see also Gall v. United States*, 552 U.S. 38

(2007) ("[Y]outh is more than a chronological fact.  It is a time and condition of life when a

persona may be most susceptible to influence and psychological damage.").  As the Supreme

Court has explained:

> [A] lack of maturity and an underdeveloped sense of responsibility are
> found in youth more often than in adults and are more understandable among the
> young.... Even the normal 16-year old customarily lacks the maturity of an adult.
> It has been noted that adolescents are overrepresented statistically in virtually
> every category of reckless behavior....[J]uveniles are more vulnerable or
> susceptible to negative influences and outside pressures, including peer pressure.
> This is explained in part by the prevailing circumstances that juveniles have less
> control, or less experience with control, over their own environment... [T]he
> character of a juvenile is not as well formed as that of an adult.  The personality
> traits are more transitory, less fixed.

*Roper v. Simmons*, 543 U.S. 661, 570 (2005).

The defendant's age at the time of the offense conduct was relied on heavily by the court

in *United States v. Stern*, which also involved a sentence well below the advisory range

recommended by the Guidelines.  The court stated:

> The Court finds several mitigating factors when it considers the individual

7

characteristics of this particular defendant.  Most critically, it takes note that Stern was 14-years old when he began to view pornographic images and, at that time, he was looking at images of girls his own age.  There is, thus, a fundamental difference between Stern, whose conduct and apparent resultant addiction began during adolescence, and the other defendants convicted of similar crimes in this district, and other courts in the federal system.

590 F. Supp. 2d at 952.  The court continued:

> Indeed, the Court has conducted a review of the scientific literature in this area and believes there is compelling evidence that the judicial system's long standing principle of treating juvenile offenders differently than adult offenders is based in part on the unformed nature of the adolescent brain.  *See, e.g.*, National Institute of Health Publication 2929, *The Teenage Brain: A Work In Progress* (2008).

*Id.*

## E.  Comparable Sentences.

A review of comparable cases in this District and elsewhere demonstrates that a sentence of one day in prison, home detention, and five years of supervised release is a sufficient, but not greater than necessary sentence in this case.

### 1.  Cases From The United States District Court for the District of Columbia.

*United States v. Moreira*, 10-cr-002 (ESH):  In this possession case, the defendant used peer-to-peer software to share files with an undercover law enforcement agent.  When the defendant was arrested, law enforcement found over 800 images and 5 videos of child pornography, including images of prepubescent children, in the defendant's possession.  While Mr. Moreira's Guidelines range was 78 to 97 months, the court sentenced him to 60 months' probation with 60 days incarceration to be served on weekends.

*United States v. Malakoff*, Cr. No. 09-cr-0051 (ESH).  In a case involving a charge for possession of child pornography, Judge Huvelle sentenced Mr. Malakoff, a 47-year old adult male, to five years' probation.  The advisory Guidelines range was 78-97 months.  As with the instant case, *Malakoff* involved both pornographic photos and videos.  As stated by Judge

Huvelle, "I've viewed some of these photos, not all by any means, a short selection.  And they're totally repugnant, I don't know how else to describe them. . . .  Having seen these pictures, I realize that these videos are profoundly disturbing."  Tr. at 32, 35.[5]  And yet, based upon the other section 3553 factors, such as Mr. Malakoff's lack of any other criminal record, a childhood sexual trauma, the punishment already inflicted by the conviction and sex offender registration requirement, and Mr. Malakoff's deep roots in the community, the Court sentenced Mr. Malakoff to no prison time at all, but rather five years' probation.

Judge Huvelle expressly addressed the issue of varying so significantly from the Sentencing Guidelines range of 78-97 months.  In addition to the factors noted above that were specific to Mr. Malakoff, the Court noted that:

> [A] review of the case law, including the only relevant cases that I found in this jurisdiction . . . indicates *that a significant percentage of cases involve substantial downward variances*.  Of the five cases that my probation department was able to identify in this jurisdiction where there was no mandatory minimum that controlled  the sentence, there were three significant downward variances in three of the five cases.

Tr. at 40 (emphasis added).

One reason Judge Huvelle and the other judges of this Court consistently vary significantly downward from the Guidelines is that the Guidelines for the child pornography offenses "do not reflect the sentencing commission's exercise of its character[istic] institutional role.  Therefore, they are not entitled to the usual deference."  Tr. at 41.  Quoting in part from Judge Roberts' bench ruling in *United States v. Matheron*, Crim No. 08-066 (RWR), Judge Huvelle stated in *Malakoff*:

> The base offense level was not derived from the sentencing commission's recommendation based upon its singular expertise and study of real sentencing

---

[5]      The relevant pages of the *Malakoff* transcript are attached as Ex. 3.

date and national experience, the way the commission determined most other base offense levels.  Over time, the level here was substantially increased, not as a result of studies by the expert body Congress created, but was ultimately key[ed] to  the increased statutory maximum sentence and the statutory mandatory minimum sentences for the trafficking offenses.  Moreover, the enhancement for the volume of images was created by legislation, not crafted or recommended by the commission based upon its careful study in correlation to sentencing goals under 3553.[6]

Nor does the guideline assure just punishment in individual cases.  The enhancement for using a computer is a undifferentiated application that fails to distinguish the level of culpability for consuming images from that of child pornographers, or from offenders using the computer for commercial profit or mass distribution.  The Supreme Court recently in 2009 in a case called [*Spears v. United States]* finally rejected the notion that policy disagreements with guideline cannot provide a basis for sentencing variances.

*Id.* at 41-42.

*United States v. Rowan*, 09-cr-225 (RMU):  Guidelines range of 97 to 120 months,

sentenced to 24 months' imprisonment with 180 months of supervised release.  Though the

defendant was charged  with possession only, the Statement of Facts accompanying his plea

agreement indicates that the defendant distributed 16 images to an undercover officer through

peer-to-peer computer software.  Upon investigation, 826 images of child pornography were

found in the defendant's possession, including images of infants and toddlers.

*United States v. Wright*, 09-cr-311 (ESH):  Guidelines range of 33 to 41 months,

sentenced to 60 months' probation.  The defendant in this case used peer-to-peer software to

download pornographic images.  About 284 images of child pornography were found in the

defendant's possession.

---

6       The legislative background on the enhancement based on the quantity of images,  which was contained in the PROTECT Act, is particularly informative.  As discussed in *Stabenow*, discussed *infra*, "two government attorneys convinced a novice Congressman to insert  [these] dramatic changes to the child pornography Guidelines into an unrelated, popular bill, *without notice* to the Sentencing Commission.  *Id.* at p. 19.  Senator Diane Feinstein compared  the changes to Arewrit[ing] the criminal code on the back of an envelope.  *Id.* at 22.

*United States v. Matheron*, 08-cr-66 (RWR):  Guidelines range of 46 to 57 months, sentenced to 12 months and 1 day of imprisonment.  The 58-year old defendant was found in possession of between 300 and 600 images of child pornography.

*United States v. DiFazio*, 07-cr-022 (RJL):  Guidelines range of 63 to 78 months, sentenced to 12 months' imprisonment.  Law enforcement recovered 458 images of child pornography.

1.      **Cases From Other Jurisdictions.**  The foregoing and the following are only a fraction of the cases nationwide that conclusively demonstrate the sufficiency of a 60-month sentence in this case.

a.      **Appellate Cases.**

In *United States v. Dorvee*, 604 F.3d 84, 95 (2d Cir. 2010), the Second Circuit reversed a within-Guidelines sentence for the distribution of child pornography as substantively unreasonable.  Relying in part on the flaws in the child pornography guidelines discussed infra, the court afforded the guideline very limited deference.  *Id.* at 95 ("the district court was working with a Guideline that is fundamentally different from most and that . . . can lead to unreasonable sentences that are inconsistent with what § 3553 requires").  The court relied on the Sentencing Commission's most recent report regarding the history of the child porn guideline, as well as other Commission reports and statistics in rejecting the district court's sentence as unreasonable.

In *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009), the Ninth Circuit upheld a sentence of five years' probation in child pornography case, where the advisory Guidelines range was 41-51 months. Offense conduct involved over 150 images of child pornography.  The district court had justified its probationary sentence on the basis that, *inter alia*, the defendant enjoyed the continuing support of his family, and a sentence of probation would allow the defendant

11

better psychiatric therapy.  *Id.* at 868.

In *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008), the Fifth Circuit upheld a sentence of five years' probation in a child pornography case, against an advisory Guidelines range of 46-57 months.

In *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009), the Sixth Circuit upheld a non-Guideline sentence of one day imprisonment and a 10-year period of supervised release for a defendant convicted of possessing between 10 and 150 images of child pornography.

In *United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008), the Tenth Circuit upheld an 18-month sentence where the advisory Guidelines sentence was 78-97 months.

## 2.        Other District Court Cases.

In *United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008), the court imposed a one-day sentence where the advisory Guidelines range was 97-120 months.

In *United States v. Phinney*, 599 F. Supp. 2d 1037 (E.D. Wis. 2009), the court imposed a six-month sentence where the advisory Guidelines range was 46-57 months.

In *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008), the court imposed a sentence of one year and one day where advisory Guidelines range was 46-57 months.

## F.        The Sentencing Commission's Report to Congress.

In February 2013, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders.  *See* U.S. Sent'g Comm'n, *Report to the Congress:  Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"].  The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences for offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges

as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and  Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees  of culpability."  *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability."  *Id.* at iii, xi; *id.* at 209, 323.  It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated."  *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional  punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their  culpability for their collecting behaviors," *id.* at 323.  The cumulative enhancements addressing  the content and volume of images possessed, "in addition to base offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders in view of the nature of their  collecting behavior."  *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct."  *Id.* at 84.  Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades"

13

beginning in the pre-Internet era, *id.* at 80.  The variety of images readily available on the Internet and found in offenders' possession ranges from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality."  *Id.* at 80-81, 90-91.  Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81.  Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like Skydrive, the program Mr. Hawkins was using, to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and  secure trading 'communities' and to evade, and help others evade, detection by law enforcement."  *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market."  *Id.* at 98-99.  There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P file-sharing."  *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life."  *Id.* at 79.  It reported that recent studies show that "appropriate 'treatment interventions . . .  are associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by

14

experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104.  Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal  or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05.  However, "the current guideline measures for offender culpability (e.g., for distribution  of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in § 2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321.  The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution, and use of a computer "be updated to account more meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting  behavior; the number of unique, as opposed to duplicate, images possessed by an

offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

**G.      The Requested Sentence.**

Mr. Hawkins asks this court to impose a sentence of one day in custody, a period of home detention with electronic monitoring that is significant in this Court's judgment (with credit for the five months already served on pretrial release in the High Intensity Supervision Program), and five years of supervised release with the condition that he undergo any further treatment deemed necessary by the Probation Officer, and that the Court grant permission for the Probation office to install monitoring software on Mr. Hawkins' computer(s). Unlike the advisory guideline range of 97-121 months in prison, the requested sentence is "sufficient, but not greater than necessary" to serve sentencing purposes under § 3553(a).

## ARGUMENT

**I.      The Relevant Law Of Federal Sentencing.**

While this Court must still correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50, and explain how the facts relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* at 101; *Pepper*, 131 S. Ct. at

1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy.  Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."  *Kimbrough*, 552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").  As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes,  even in a mine-run case."  *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances.  In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)."  U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009).

This Court may thus properly find that the child pornography guideline was not

17

developed  by the Commission in its characteristic institutional role of basing its determinations

on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with

the Supreme Court's repeated recognition that when a guideline was not developed by the

Commission based  on empirical data of past sentencing practices and national sentencing

experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that

might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is

not subject to "closer review" and is "not suspect."  *See Kimbrough*, 552 U.S. at 109-10; *Spears*,

555 U.S. at 264; *Rita*,  551 U.S. at 348, 349-50.[7]

---

[7]       *See also United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of
discretion review to a district court's policy-based downward variance from § 2G2.2 because
"the Commission did not do what 'an exercise of its characteristic institutional role'
required—develop § 2G2.2 based on research and study rather than reacting to changes adopted
or directed by Congress"); *id.* at 608-09 ("Congress, of course. . . may enact directives to the
Commission which the Commission is obliged to implement," but "*Kimbrough* permits district
courts to vary even where a guideline provision is a direct reflection of a congressional
directive"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough's* holding that
"it was not an abuse of discretion" for a district court to disagree with the crack guidelines
"because those particular Guidelines 'do not exemplify the Commission's exercise of its
characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v.
Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not
developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its
characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from
them based on reasonable policy disagreement as  they do from the crack-cocaine Guidelines
discussed in *Kimbrough*."); *id.* 963 n.3 ("That Congress has the  authority to issue sentencing
directives to the Commission" and "that the Guidelines conform to  Congressional directives
does not insulate them from a *Kimbrough* challenge."); *United States v. Stone*,  575 F.3d  83,
89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power  even
where a guideline provision is a direct reflection of a congressional directive," including the
career offender, fast-track, and child pornography guidelines); *id.* at 93-94, 97 (district court may
choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but
the "guidelines at issue are in our judgment harsher than necessary" and "we would have used
our *Kimbrough* power to impose a  somewhat lower sentence"); *United States v. Halliday*, 672
F.3d 462, 474 (7th Cir. 2012) (district courts  are "at liberty to reject any Guideline on policy
grounds," but defendant did "not argue that the district  court was unaware of its discretion to
disagree with the [child pornography] Guidelines"); *United States v. Regan*, 627 F.3d 1348,
1353-54 (10th Cir. 2010) (defendant's argument for a policy-based variance from § 2G2.2 was
"quite forceful" but he "did not raise the argument that the Guidelines are entitled to less

**II.    Given the Nature and Circumstances of Mr. Hawkins' Offense and His History and Characteristics, the Sentence Requested Is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration.  *See* S. Rep. No. 98-225, at 67 (1983).  Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has."  *Id.* at 68.  In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a).  *Id.* at 119.  "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations."  *Id.; see also United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, all of the purposes of sentencing point in the same direction.  Mr. Hawkins' offense is less serious than the offenses Congress had in mind, and Mr. Hawkins is not the dangerous offender Congress envisioned.  Incarceration is not necessary to protect the public, and would be a particularly harsh punishment for Mr. Hawkins, who is just 19-years old and barely an adult.  Mr. Hawkins' age, family circumstances, education, intelligence and obvious potential point to a very low risk of further offending.

**A.    The Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A).**

deference because they are not the result of empirical study by the Commission").

       1.       **Seriousness of the offense.**

Congress's actions with respect to the child pornography guideline have stemmed in large

part from the belief that those who view child pornography are actually child molesters.[8]  Under

this view, punishing child pornography possessors serves as a proxy for punishing child sexual

abusers.  Aside from the lack of evidence to support this belief in general, *see Child Porn Report*

at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other

sex offending"), Mr. Hawkins has not been convicted of sexually abusing a child, has not in fact

sexually abused a child, and is at a low risk of reoffending.  *See Giunta Report* at 4.  This

distinguishes Mr. Hawkins from the offenders Congress had in mind, and is therefore highly

relevant.  *See United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012)

(rejecting presumption that "those who view child pornography are indistinguishable from those

who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that

viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F.

Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline range is

appropriate because of the "chance that [defendant] will molest children in the future, or that he

has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and

Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical

---

[8]     *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing
increase to base offense level from 10 to 13); *id.* at H6736, H6738 (Sept. 24, 1991)
(Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in
support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec.
S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution"
enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney
Amendment, which included number-of-images enhancement); *see also* Child Pornography
Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep.
No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov.
1, 2000).

testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober*, 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), *aff'd* 624 F.3d 592 (3d Cir. 2010).  The Commission has confirmed that the possession of  even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]."  *Child Porn Report* at 204.

Another primary justification for severely punishing child pornography possessors is that they support the market for child pornography and thus encourage the abuse of more children in order to create new images.  *See* 136 Cong. Rec. S4730 (Apr. 20, 1990).  Aside from the evidence that disproves this belief in general, Mr. Hawkins did not pay for or trade any images.  Under these circumstances, where no economic or other incentive was given to anyone to create or post more or newer images, there was "no market effect" from Mr. Hawkins' actions.  Troy Stabenow, *A Method for Careful Study:  A Proposal for Reforming the Child Pornography Guidelines*, 24 Fed. Sent'g Rep. 108, 124-25 (2011) [Stabenow, *A Method for Careful Study*]. There is no research to support the theory that criminal punishments have affected the child pornography markets since the advent of the Internet and file sharing programs.  *Child Porn*

21

*Report* at 98.

In addition, technology has changed the nature of this offense.  In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort – as this case demonstrates all too well, e.g., images taken from YouTube.  As a result, much less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously.  Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it.  In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer.  *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996) [U.S. Sent'g Comm'n, *1996 Report*].  In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer.  U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011); U.S. Sent'g Comm'n, 2011 *Sourcebook of Federal Sentencing Statistics*, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed.  *See* Andreas Frei et al., *Paedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007).  In short, the

change in technology is relevant, in part, because it means that even as the population of child pornography offenders has become less dangerous, punishment has greatly increased.  *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders:  Written Testimony Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012).

According to the Commission, "technological changes have resulted in . . .  ready accessibility of child pornography," including graphic sexual images of very young victims, which "previously was not widely circulated."  *Child Porn Report* at 6.  Now that the "typical" child pornography case involves images depicting "prepubescent children engaging in sexually explicit conduct," *id.* at 84, the current guideline "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors" and is "overly severe for some offenders in view of the nature of their collecting behavior," *id.* at 322-23, such as those like Mr. Hawkins who did not deliberately or discriminatingly select or catalogue their images, *id.* at 84-92.

Mr. Hawkins' conduct and characteristics could not be further removed from the offenders Congress was contemplating.  Mr. Hawkins has never come remotely close to improperly touching a child, he did not look hard for the images (indeed, the first ones were from YouTube), Mr. Hawkins admitted what he had done as soon as the agents appeared with a search warrant, and he has fully accepted responsibility for his offense.  Dr. Giunta concluded that Mr. Hawkins presents a low risk of reoffending.  His family reports that this behavior was not consistent with his character and believes that he will never engage in that kind of behavior again.  Mr. Hawkins is the offender for whom the minimum statutorily authorized punishment is appropriate.

23

One of the goals of the SRA was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). The child pornography guideline fails that goal, as several courts have noted. *See, e.g., United States v. Dorvee*, 616 F.3d 174, 187 (2010); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702. A defendant who used a computer to entice a 12-year old to engage in illegal sexual activity, but was caught before actually having sex with the child, would receive an offense level of 30, *see* § 2G1.3(a)(3), (b)(3), three levels below Mr. Hawkins' offense level under § 2G2.2. In order to receive an offense level of 33 as Mr. Hawkins did for viewing child pornography, one could, for example, attempt to commit first degree murder, *see* § 2A2.1(a)(1); commit rape resulting in more than serious but less than permanent bodily injury, *see* § 2A3.1(a)(2), (b)(4); hold a person in involuntary servitude for over a year by use of a weapon and cause permanent bodily injury, *see* § 2H4.1(a)(1), (b)(1), (b)(2), and (b)(3); or rob a bank of $800,000, while brandishing a weapon and causing bodily injury, *see* § 2B3.1(a), (b)(1), (b)(2), (b)(7).

Mr. Hawkins now recognizes the great harm inflicted on the victims depicted in these images. He has reached a clear understanding of how viewing these images negatively impacts the child victims.

### 2.    Just punishment .

Since the inception of the guidelines, the Commission has acknowledged that home confinement is a "form of punishment" that may be "equally efficient" as incarceration for an elderly and infirm defendant. USSG § 5H1.1. A sex offender who is too young to defend himself may face the harshest possible consequences. One judge recently reported: "The last defendant this Court was required to sentence to the mandatory five-year prison term for receipt

of child pornography, a 72–year old retired attorney, was beaten to death within days of arriving

at the federal penitentiary." *Kelly*, 868 F. Supp. 2d at 1204 n.1; *see also Inmate Sentenced to 15*

*Years to Life in Prison for Beating-Murder of Fellow Inmate Believed to be in Custody for Child*

*Molest[ation]*, Orange County, California District Attorney Press Release, Mar. 21, 2012)

(inmate convicted of misdemeanor possession of child pornography, a 72-year old attorney, was

beaten to death within days of arriving at federal prison); Kristen Dize, *Harford County Sex*

*Offender Killed in State Prison,* BELAIRPATCH, June 28, 2012; Rina Palta, *For the third time*

*this month, a sex offender is killed in prison*, May 29, 2012.[9]  As the above examples

demonstrate, the risk of violent assault on Mr. Hawkins, who is a very vulnerable young man to

begin with, is very real.

      Mr. Hawkins also must register as a sex offender, with the publication of that information

to the community and his friends and neighbors.  Mr. Hawkins' sexual offender designation will

effectively make him a societal outcast for the next 15 years or more.  He will be banned from

living in many neighborhoods and even entire towns.  *See, e.g.*, Ex. 4 (May 21, 2013 *New York*

*Times* Op-ed, "Sex Offender Village" and October 1, 2013, *New York Times*, "Restricted Group

Speaks Up, Saying Sex Crime Measures Go Too Far").  Mr. Hawkins name and address will be

readily available on the Sex Offender Registry, something anyone with a computer can view.

Finding employment as a registered sex offender will be nearly impossible.  As set forth in the

*New York Times* piece:

> We live in a society that is terrified of sex offenders, sometimes with good
> reason.  But in some cases the perpetrators, and not just the victims, are denied
> justice.  Every high-profile sex crime spawns a rush to do something about the
> "predators" among us.  Unfortunately, these so-called solutions are doing more
> harm than good.  In the past 25 years, the laws governing sex offenses have gone

---

[9]      Available at http://www.scpr.org/blogs/news/2012/05/29/6370/inmate-killed-la-prison/

from punitive to draconian to senseless.  The term "sex offender" simply covers too wide a range now, painting the few truly heinous crimes and the many relatively innocuous ones with the same broad brush.  This overly broad approach wastes resources that could be better spent, for instance, on clearing the huge and unforgivable backlog of untested rape evidence kits.

We see even deeper problems: the explosion of sex offender registries, stringent yet demonstrably ineffective residency restrictions, and the bizarre world of "civil commitment," where we punish what someone might do rather than what he or she has done.  All of this suggests that our entire approach to dealing with sex offenders has gone tragically off the rails.

Ex. 4.

As several courts have recognized, the collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.  *See, e.g., United States v. Garate*, 543 F.3d  1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics  of the defendant," the need to "protect the public from further crimes of the defendant," the need  to

"provide just punishment for the offense," and the need to "afford adequate deterrence").

### B.       The Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B).

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime.  *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding  that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal  deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican  presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between  probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug  Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism

and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"]. And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography. As explained further below, this is in part because the production and dissemination of child pornography is a widespread, international problem. There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."). The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or non-commercial 'markets' since the advent of the Internet and P2P file-sharing." *Child Porn Report* at 98.

### C.   The Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C).

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. This belief is contrary to the empirical research in general, and is wholly unjustified

under the specific facts and circumstances of this case.

Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," *Written Statement of Michael C. Seto, Ph.D., C. Psych. Before the U.S. Sent'g. Comm'n* at 4 (Feb. 15, 2012),[10] and "online offenders who had no history of contact offenses almost never committed contact sexual offenses."  Michael C. Seto et al., *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011); *see also Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n,* at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years);[11] Helen Wakeling et al., *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex  Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for  six years after initial offenses found that only two offenders (0.8%) committed a

---

[10]    Available at
        http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/
        20120215-16/Testimony_15_Seto.pdf.

[11]    Available at
        http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/
        20120215-16/Testimony_15_Wollert_2.pdf.

contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and

concluded that "the consumption of child pornography alone does not seem to represent a risk

factor for committing hands-on sex offenses . . . at least not in those subjects without prior

convictions for hands-on sex  offenses"); Michael C. Seto & Angela W. Eke, *The Criminal*

*Histories and Later Offending of Child Pornography Offenders*, 17 Sexual Abuse 201, 207-08 &

tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only

recidivated with contact sex  offenses; "our finding does contradict the assumption that all child

pornography offenders are at very high risk to commit contact sexual offenses involving

children."); L. Webb et al., *Characteristics of Internet Child Pornography Offenders: A*

*Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only

offenders "significantly less likely to fail  in the community than child molesters," and

concluding that "by far the largest subgroup of  internet offenders would appear to pose a very

low risk of sexual recidivism").  As one district court recently put it, "the empirical literature []

generally concludes that there is little—if any— evidence of a direct correlation between viewing

child pornography and the viewer's commission  of 'contact' sexual offenses." *Marshall*, 870 F.

Supp. 2d at 492.

Not only are child pornography offenders at low risk to re-offend in general, but "on the

Sexual Violence Risk-20 (SVR-20), a risk assessment tool, Mr. Hawkins scored in the low risk

category. *Giunta Report* at 4.  Indeed, Mr. Hawkins' history and characteristics make him an

extremely low risk to re-offend.  The Commission's research demonstrates that employment,

education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g

Comm'n, *Measuring  Recidivism* at 12-13 & Ex. 10; U.S. Sent'g Comm'n, *Recidivism and the*

"*First Offender,*" at 8 (2004), as does substantial other research.[12]  As the Commission reports, recent studies show that "appropriate 'treatment interventions . . .  are associated with lower rates of recidivism—some of them very significant'" *Child Porn Report* at 278 & n.31 (citing a project funded by the Department of Justice), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

In short, Mr. Hawkins' young age, strong family support, and education, as well as the nature and circumstances of his crime, strongly support the conclusion that he is most unlikely to re-offend.  While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Hawkins is simply not one of them.  The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case.  All of the evidence indicates that Mr. Hawkins will never view child pornography again.  Supervised release with appropriate conditions is more than sufficient to ensure that he never does.

> **D.     The Need for Medical Care and Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D).**

As a "sex offender," Mr. Hawkins would not be eligible for placement in a Bureau of Prisons' prison camp.  That is because one's status as a "sex offender" is a "Public Safety Factor (PSF)" that BOP uses to bar placement at a prison camp.  *See* P.S. 5100.08, Ch. 5 (Ex. 1).  Given

---

[12]     *See* Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, *Recidivism Among Federal Prisoners Released in 1987*, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/ published_reports/recidivism/oreprrecid87.pdf; *Correctional Service Canada, Does Getting Married Reduce the Likelihood of Criminality*, Forum on Corrections Research, Vol. 7, No. 2 (2005); Robert J. Sampson & John H. Laub, *Crime and Deviance Over Life Course:  The Salience of Adult Social Bonds*, 55  Am. Soc. Rev. 609 (1990); Robert J. Sampson, John H. Laub & Christopher Winer, *Does Marriage  Reduce Crime?  A Counterfactual Approach to Within-Individual Causal Effects*, 44 Criminology 465, 497-500 (2006); Shirley R. Klein et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002).

this situation, it is far more desirable that Mr. Hawkins receive psychological (and perhaps psychiatric) care in the community, as opposed to in prison.

> ### E.   The Requested Sentence Avoids Unwarranted Disparities and Unwarranted Similarities.

This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004). As discussed, the guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case. The guideline range fails to take into account any of Mr. Hawkins' characteristics demonstrating that there is no need to imprison him to protect the public and that treatment and rehabilitation will be achieved in the most effective manner in the community.

In this case, a substantial variance is necessary to avoid unwarranted uniformity between Mr. Hawkins and dissimilar defendants who committed dissimilar conduct. *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities"). This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108. The data show that a sentence of one day in custody, a significant

period of home confinement, and supervised release for five years would not create unwarranted disparity.

In fiscal year 2011, only 32.8% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range, and 65.6% were below the range.  Judges imposed below-range sentences in 48.1% of cases without a government motion, in 14.6% of cases based  on a government motion for a variance, and in 3% of cases based on a government motion under § 5K1.1.  *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28.  In contrast, the average rate of below-range sentences without a government motion in all cases was  only 17.4% and the government sought variances in only 4.4% of all cases.  *Id.*, tbl.N.  In fiscal year 2011, forty-seven defendants sentenced under § 2G2.2 nationwide received no imprisonment or a term of imprisonment no more than six months, and forty-four of these defendants were in Criminal History Category I like Mr. Hawkins.  *See Placement of Sentences Under U.S.S.G. §2G2.2 – FY 2011* at 4, http://www.fd.org/docs/select-topics---sentencing/placement-of-sentences-under-u-s-s-g-2g2-2---fy-2011.pdf?sfvrsn=4.

**<u>CONCLUSION</u>**

For the reasons stated, Mr. Hawkins respectfully requests that this Court impose the requested sentence of one day in custody, a period of home detention  with electronic monitoring that is significant in this Court's judgment (with credit for the five months already served in the HISP), and five years of supervised release.

Respectfully submitted

/s/
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Avenue, N.W. Suite 550
Washington, D.C. 20004
(202) 208-7500
*Counsel for Wesley Hawkins*